UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KEVIN D'COSTA, | Civil Action No. 15-5310 (MCA) |
| Plaintiff, | |
| v. | OPINION |
| J. PLAZA, et al., | |
| Defendants. | |

## I.   INTRODUCTION

This matter has been opened to the Court by a motion for summary judgment brought by Defendants Corrections Officer Recruit Jonathan Plaza and Senior Corrections Officer Cesar Maschang.  For the reasons explained in this Opinion, the motion for summary judgment is denied without prejudice. Based on Plaintiff concession that he is not challenging any policies or regulations governing prayer at Northern State Prison, the Court dismisses that aspect of his free exercise claim. The Court, however, denies summary judgment as to whether Defendants intentionally interfered with Plaintiff's exercise of his religion.

## II.   FACTUAL BACKGROUND

### a.   The March 1, 2015 Assault

On March 1, 2015, Plaintiff was nearing the end of a four-and-a-half-year period of incarceration at Northern State Prison.[1]  Plaintiff, a Muslim, regularly engaged in individual prayer in the Day Room of the Charlie 1 East Unit of Northern State Prison ("C1E"), the housing unit to which he was assigned. (See Gibbons Cert., Ex. A, 39:2-4.)

---

[1] During his incarceration, he had not been charged with any institutional infractions and had earned a reputation as an individual who was "not a problem" for corrections officers. (See Certification of Adam Robert Gibbons ("Gibbons Cert."), Ex. A, 10:19 - 12:1; 125:1-9; see also

On March 1, 2015, Corrections Officer Recruit Plaza, was on duty in the Day Room. *See* Gibbons Cert., Ex. F.) From the beginning of his shift, Defendant Plaza was behaving in an "aggressive" manner, and "degrading" inmates. *(Id.,* Ex. F, 13:24- 17:11.) He turned off all of the televisions on the unit and ordered inmates to remove their head coverings known as "wave caps," despite the fact that inmates were permitted to watch television and wear wave caps. (*Id.,* 14:7 - 16:12; *see also* Gibbons Cert., Ex. A, 38:3-11.) When he was presented with paperwork showing that television and wave caps were permitted in ClE, he "didn't care." (*See* Duffy Cert., Ex. F, 16:13-19.)

Defendant Plaza also apparently believed that DOC policy prohibited inmates from praying in the Day Room. (*Id.,* Ex. A, 73:8 - 78:20.) Plaintiff disputes that DOC policy prohibits individual prayer in the Day Room. The Inmate Handbook for Northern State Prison (the "Inmate Handbook") explicitly prohibits unauthorized "religious gatherings" and "group prayer" in any area of the housing unit. (*See* Duffy Cert., Ex. D, DOC952, No. 29.) A DOC policy titled "Scheduling of Religious Activities and Use of Ritualistic Elements for Islam," (*id.,* Ex. E), provides that Muslim inmates "should have an opportunity to pray five times daily," and that, "if necessary prayers can be made at work details sites [sic], school or units during break times." (*Id.,* p. 5.) Dr. Malachia Brantley, Jr., the Supervisor of Chaplains at Northern State Prison, believes that prayer is prohibited in certain areas of Northern State Prison, including the Day Room, but is not aware of a written policy to that effect, and is not aware of any instances in which a no-prayer policy has been enforced at Northern State Prison. (*Id.,* Ex. C, 15:25 -16:6; *see also* Duffy Cert., Ex. C, 25:6-18.)

---

Certification of Kevin J. Duffy ("Duffy Cert."), Ex. F, 34:19-35:3.)

On March 1, 2015, Defendant Plaza called Plaintiff to his podium and informed him that inmates are not permitted to pray in the Day Room. (*See* Gibbons Cert., Ex. A, 37:13 - 42:10.) Plaintiff asked, "Since when?" (*Id.*, 39:2-4.) Defendant Plaza told Plaintiff that he did not care what Plaintiff had previously been permitted to do, and that "today, you're not doing it." (*Id.*, 39:5-7.) As the discussion continued, Defendant Plaza was "talking with his hands." (*Id.*, 60:6-18; *see also* Duffy Cert., Ex. F, 20:20- 21:3.) Plaintiff stepped back out of concern that Defendant Plaza would inadvertently hit him. (Gibbons Cert., Ex. A, 60:6-18.) When Defendant Plaza asked Plaintiff why he was stepping back, and Plaintiff explained, and Defendant Plaza replied, "[I]f I hit you, you don't have to worry about that because you're not on my level." (*Id.*) Plaintiff expressed his intention to return to his cell and began walking in that direction. (*Id.*, 39:8-16). Plaintiff briefly turned toward Defendant Plaza (*see* Ex. F), and Defendant Plaza came around from behind his podium and discharged his pepper spray onto Plaintiffs face. (Gibbons Cert., Ex. A, 39:13-21; *see also* Ex. D, 21:1-3, 22:19-23:17; Ex. F.) Although Defendant Plaza later reported that he discharged his pepper spray in response to Plaintiff "lung[ing] forward," the video evidence does not show Plaintiff lunging forward, and eyewitnesses recounted that Plaintiff was facing away from Defendant Plaza when he discharged the pepper spray. (*See* Duffy Cert., Ex. M; Gibbons Cert., Ex. F; Duffy Cert., Ex. G; Duffy Cert., Ex. F, 22:6-23:8.)

As Plaintiff walked toward the shower to attempt to wash off his face, Defendant Plaza returned to his podium to call a Code 33, an emergency notification. (*See* Gibbons Cert., Ex. A, 40:2-11.) When Plaintiff walked back into the Day Room, Defendant Plaza tackled him from behind. (*Id.*, 40:12-14.) Defendant Plaza does not recall giving Plaintiff an order before tackling him to the ground, or saying anything at all to Plaintiff, and does not allege that Plaintiff was

3

making any threatening statements at the time that he tackled Plaintiff to the floor. (*See* Duffy Cert., Ex. A, 115:14 - 117:24.) Defendant Plaza told Plaintiff that he was going to show him that he "ain't tough." (*See* Gibbons Cert., Ex. A, 40:15-16.) While Plaintiff was pinned face-down to the floor, Defendant Plaza pulled out some of his dreadlocks, and punched him in his ribs. (*See* Duffy Cert., Ex. F, 25:17 -26:1.) As other corrections officers responded to the Code 33 and surrounded Plaintiff, his hands were restrained behind his back. (*See* Gibbons Cert., Ex. A, 40:17-22.) Plaintiff testified that Defendant Maschang punched Plaintiff multiple times in his right rib, and the vantage of the surveillance video does not clearly show the amount of force used to restrain Plaintiff. (*Id.*, 40:23-24; *see also* Gibbons Cert., Ex. F.)

Plaintiff was then carried out through the Day Room to an adjoining hallway known as the Sally Port, where there are no surveillance cameras. (*Id.*, 54:23-55:8, 69:23-70:24.)  There, Plaintiff was again pinned face-down to the concrete floor while Defendants Plaza and Maschang, and the other corrections officers continued their assault against him. (*Id.*, 63:1-19, 72:2-13.) Plaintiff, who was not resisting, was told repeatedly by the corrections officers surrounding him to stop resisting. (*Id.*, 72:14-19.) He was kicked and punched. (*Id.*, 72:20-25.) Although at least five corrections officers participated in the assault against Plaintiff in the Sally Port, Plaintiff was aware that Defendants Plaza and Maschang were among the participants because they both spoke to him: Defendant Plaza telling Plaintiff that he thought he was tough, and that Defendant Plaza would "show [him] who the tier was being operated by," and Defendant Maschang telling Plaintiff that he was going to "show [you] Muslims." (*Id.*, 72:2-13, 75:19 - 76:4, 79:16-22; Ex. X (wherein Plaintiff clarified that statements regarding Muslims were made by Defendant Maschang).) Defendants Plaza and Maschang both conceded that they were present in the Sally Port immediately after the incident in the Day Room. (*See* Duffy Cert.,

Ex. A, 213:2-11 (wherein Defendant Plaza confirmed that he briefly left his post in the Day Room to enter the Sally Port, immediately after Plaintiff was led into the Sally Port); *Id.*, Ex. V, 132:19-134:19 (wherein Defendant Maschang confirms that he was one of two corrections officers to escort Plaintiff from the Day Room into the Sally Port).) While pinned to the floor in the Sally Port, a plait of Plaintiffs dreadlocks was cut out. (*See* Gibbons Cert., Ex. A, 63:13 - 64:5.) The assault against Plaintiff in the Sally Port continued for five to ten minutes. (*Id.*, 71:13-16.)

In accordance with DOC policy requiring a medical evaluation of inmates involved in altercations, Plaintiff was then escorted to the medical building by Defendant Maschang and another corrections officer. (*Id.*, 95:23 - 96:8; *see also* Duffy Cert., Ex. FF). During the escort, immediately outside the exit of the Charlie Unit, Defendant Maschang again punched Plaintiff in his right rib, after which Defendant Maschang was reminded by the other corrections officer that they were in view of cameras. (*Id.*) Upon arrival to the medical building, Defendant Maschang accompanied Plaintiff into a nurse's station. (*Id.*, 106:14- 107:2.) When the nurse asked Plaintiff if he was okay, Officer Maschang responded before Plaintiff could, indicating that Plaintiff was okay. (*Id.*) Plaintiff said that his side hurt and that he wanted medical attention. (*Id.*) Plaintiff was not provided with any medical evaluation or treatment, but was instead rushed out of the medical building into a detention area. (*Id.*) Plaintiff was placed into a solitary unit, where he was stripped naked and searched. (*Id.*,122:3-123:16.) Plaintiff remained naked until he was provided with a "suicide blanket" to cover himself. (*Id.* 123:7-16.) The solitary unit was cold, but the half of Plaintiffs body that was still covered in pepper spray was hot. (*Id.*, 124:3-15.) He was kept in the solitary unit until the next day. (*Id.*, 132:8-24.)

5

### b. Exhaustion of Administrative Remedies

Following the assault, Plaintiff followed the prescribed grievance reporting procedures to notify Northern State Prison of the assault against him. The Inmate Handbook sets forth an Inmate Remedy System, pursuant to which inmates are required to submit an Inmate Remedy Form in an attempt to resolve any complaints. (*See* Gibbons Cert., Ex. Q, DOC921). In March 2015, within days of the assault, Plaintiff submitted an Inmate Remedy Form regarding the March 1, 2015 assault by Defendants Plaza and Maschang. (*Id.*, Ex. A, 201:19-202:1, 210:23 - 211:7, 217:5-20; *see also* Ex. R (example of an Inmate Remedy Form, dated June 28, 2014); *see also* Duffy Cert. Ex. R, DOC34 (the same June 28, 2014 Inmate Remedy Form, appearing as the last page of Exhibit D-5, which Plaintiff confirmed to be the same type of form that he submitted regarding the March 1, 2015 assault).) When Plaintiff initially submitted the Inmate Remedy Form, it was returned to him with instructions to provide more information. (*See* Gibbons Cert., Ex. A, 218:3-10.) In response, Plaintiff prepared a typed statement titled "Inmate Grievance Complaint," and re-submitted the Inmate Remedy Form with the "Inmate Grievance Complaint" annexed thereto. (*Id.*, 218:3-10, 222: 10-17; Ex. J.) Plaintiffs Inmate Remedy Form was returned to him in March 2015, with instructions to instead submit an Inmate Inquiry Form, which Plaintiff submitted. (*See* Gibbons Cert., Ex. A, 203:14-24 (wherein Plaintiff clarified that this second form is actually the form known as an Inmate Inquiry Form); *see also* Duffy Cert., Ex. R, DOC33 (the second-to-last-page of Exhibit D-5, which Plaintiff confirmed to be the same type of form that he submitted after the Inmate Remedy Form was returned to him).)

An Inmate Contact Form maintained by the Office of the Corrections Ombudsman summarizes a telephone call from Plaintiff on April 16, 2015, stating, in relevant part: "Inmate claims that he was assaulted by custody staff on 3/1/15 on [Charlie 1 East]. Inmate submitted an

Inmate Inquiry Form on 3/27/15 and has not received a response and has not been interviewed by [the Special Investigations Division]." (*See* Duffy Cert., Ex. N.)

In response to Plaintiffs April 16, 2015 communication to the Ombudsman, the Ombudsman referred the matter to Northern State Prison administrators for further review. (*Id.,* Ex. N - 0). Chief Investigator Alfonso of the Special Investigations Division ("SID") assigned a subordinate to investigate. (*Id.,* Ex. S.) The subordinate confirmed later that day that the SID would undertake an "administrative investigation into the allegations of assault." (*Id.,* Ex. 0.) The subordinate also noted that "our files did not contain any record of [Inmate Remedy Forms] containing these current allegations." (*Id.*) On June 27, 2016, the Senior Investigator issued a report finding that there was no evidence to corroborate Plaintiff's allegations.  (*See* Gibbons Cert., Ex. T, Doc766.)

In connection with this summary judgment motion, the current Inmate Remedy Coordinator at Northern State Prison has submitted a certification stating that she conducted a search at Northern State Prison for Inmate Remedy System Forms and Inmate Inquiry Forms submitted by Plaintiff, and that there is no record at Northern State Prison of any Inmate Remedy System Forms or Inmate Inquiry Forms submitted by Plaintiff in connection with the assault. (*See* Gibbons Cert., Ex. O at ¶¶ 49.)

### III.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the

suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 447 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002).

The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. *Celotex*, 477 U.S. at 330. "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg.*, Inc., 243 F.3d 130, 138 (3d Cir. 2001). The non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005) (quotations omitted). Under *Anderson*, Plaintiffs' proffered evidence must be sufficient to meet the substantive evidentiary standard the jury would have to use at trial. 477 U.S. at 255. To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotations omitted); *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.

*Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

**IV.    ANALYSIS**

Defendants make the following five arguments for summary judgment: Plaintiff failed to exhaust his administrative remedies; the "third episode of assault" against Defendant Maschang is barred by the statute of limitations; Plaintiff is unable to prove Defendant Plaza's and Defendant Maschang's personal involvement in the portion of the assault that occurred in the area known as the Sally Port; Plaintiff is unable to prove Defendant Maschang was personally involved in denying him medical care; and Defendants are entitled to qualified immunity with respect to Plaintiff's free exercise claim and the force used against Plaintiff in the Day Room. The Court addresses each argument below.

**a.  Exhaustion of Administrative Remedies**

Defendants first argue that they are entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies. At issue is whether Defendants have met their burden on this motion to show that Plaintiff failed to exhaust his administrative remedies.

The PLRA requires inmates to exhaust prison grievance procedures before suing in court. 42 U.S.C. § 1997e(a). "[T]o properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules,' rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 153 (3d Cir. 2016).

In *Small v. Camden County*, an inmate submitted two grievances "in compliance with [the prison's] procedures," but "no decision" was rendered on either of them and prison rules

required inmates to wait for a decision before filing an appeal. 728 F.3d at 273. The Third Circuit reasoned that "[b]ecause [the prison's] procedures did not contemplate an appeal from a non-decision, when [the inmate] failed to receive even a response to the grievances ... much less a decision as to those grievances, the appeals process was unavailable to him." *Id.* In *Robinson v. Superintendent*, 831 F.3d 148, 153-54 (3d Cir. 2016), the Third Circuit similarly held that the exhaustion requirement is satisfied where prison officials fail to timely respond to an inmate's properly filed grievance. *See also Martin v. Gearhart*, 712 F. App'x 179, 183–84 (3d Cir. 2017) (explaining same).

To grant summary judgment in favor of Defendants, the Court would need to resolve a material factual dispute regarding whether Plaintiff submitted his grievances in compliance with prison procedures and the directions of prison officials but received no response. Although Defendants maintain that Northern State Prison has no record of any Inmate Remedy System forms or Inmate Inquiry forms submitted by Plaintiff in connection with the assault, (*see* Gibbons Cert., Ex. O at ¶¶ 4-9), Plaintiff asserts in sworn deposition testimony that he submitted two Inmate Remedy System Forms, which were returned to him, and subsequently, at the direction of prison officials, submitted a Prison Inquiry Form but received no response. Furthermore, an Inmate Contact Form maintained by the Office of the Corrections Ombudsman summarizes a telephone call from Plaintiff on April 16, 2015, in which Plaintiff stated that he submitted an Inmate Inquiry Form on March 27, 2015, but did not receive a response.

Defendants argue that Plaintiff is unable to assert that the prison grievance system was unavailable to him under *Small* because Plaintiff has failed to produce in discovery either the Inmate Remedy System Form(s) that he claims was returned to him or a copy of the Inmate Inquiry Form he was instructed to submit in its place. They reason that "his only evidence

supporting his contention that the system was a dead end was lost while in his sole possession" and that the Court should not reward Plaintiff for his own spoliation. *See* ECF No. 83-1, Moving Br. at 20-21. The Court disagrees.

In *Paladino v. Newsome*, 885 F.3d 203, 211 (3d Cir. 2018), the Third Circuit broadly held that "some form of notice to the parties and opportunity to respond are needed before a District Court elects to resolve factual disputes regarding exhaustion under *Small*." *Id.* At minimum, the district court must notify the parties that it will consider exhaustion in its role as fact finder under *Small* before doing so. Second, although a hearing is not always required, a district court must always permit the parties to submit additional materials relevant to exhaustion that are not presently before the court. *Id.*

Although Defendants argue otherwise, this case is not meaningfully distinguishable from *Paladino*. In *Paladino*, as in this case, the main factual issue was a discrepancy between the prison's records and the sworn deposition testimony of the inmate, who stating that he submitted at least six forms for his 2010 excessive force claim. The defendants in *Paladino* argued that Paladino should be disbelieved because prison records showed that he submitted other grievances during the relevant period, but no grievances related to the incident of excessive force. The Third Circuit disagreed and held that the success of defendants' argument hinged on the reliability of the prison's recordkeeping system and found that record bereft of evidence that the Prison's record keeping system was reliable. To the extent the prison was unable to show its record keeping system was reliable, the Third Circuit indicated that an evidentiary hearing would be warranted to resolve the issue of whether Paladino exhausted his administrative remedies on the excessive force claim. *See id.*

11

Defendants argue this matter is factually distinguishable from *Paladino* because Plaintiff's Inmate Remedy Form was returned to him twice – first with a request for more details and subsequently with instructions to submit an Inmate Inquiry Form – and Plaintiff has failed to produce in discovery the Inmate Remedy Form that was returned to him. Without determining these issues but construing the facts in a light most favorable to Plaintiff, it appears to the Court that both sides may have failed to preserve evidence relevant to the question of exhaustion. Plaintiff may have failed to keep the Inmate Remedy Form that was returned to him. DOC officials may have given Plaintiff the wrong information about the type of grievance form he needed to submit and subsequently lost or destroyed the Inmate Inquiry Form that Plaintiff submitted thereafter. And, as in *Paladino*, Defendants have not provided <u>any evidence</u> that the record keeping system at Northern State Prison was reliable during the relevant time period, or that prison officials did not lose the Inmate Inquiry Form submitted by Plaintiff. These issues cannot be resolved on the record before the Court.

For the reasons explained in this Opinion, there are material factual disputes regarding whether Plaintiff exhausted his administrative remedies and the Court will deny without prejudice the motion for summary judgment on the issue of exhaustion.[2] To the extent Defendants believe they can prove the reliability of the record-keeping system at Northern State Prison or otherwise establish that Plaintiff failed to exhaust, Defendants are free to seek an evidentiary hearing, or other appropriate hearing, on exhaustion prior to trial.

---

[2] Having determined issues of material fact prevent the Court from determining whether the prison grievance system was unavailable under *Small*, the Court need not address Plaintiff's remaining arguments regarding unavailability. To the extent Defendants seek an evidentiary hearing on exhaustion, however, Plaintiff is free to raise these arguments anew.

### b. The "Third Episode of Assault" by Maschang

Defendants' next argue that "the third episode of assault" on March 1, 2015 is barred the statute of limitations. "The Third Episode of Assault" are punches to Plaintiff's right side delivered by Defendant Maschang outside the exit of the Charlie Unit immediately following the beating in the Sally Port area. Defendants argue that the Third Episode of Assault is time barred because it was not explicitly described in the Amended Complaint.

Plaintiff argues that the Amended Complaint pleaded only a single claim of excessive force, and the Amended Complaint's failure to mention these specific punches by Maschang at the exit of the Charlie Unit does not bar his claim against Maschang. Furthermore, Plaintiff argues that an amendment of the Complaint to include this incident would relate back to the date of the original pleading under Fed. R. Civ. P. 15.

The Court agrees with Plaintiff that he was not required to present in his Amended Complaint an itemized inventory of every single kick and punch delivered by Defendants. The adequacy of Plaintiffs pleading is governed by Fed. R. Civ. P. 8 and the *Iqbal/Twombly* standard. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (applying the *Iqbal/Twombly* pleading standard to a § 1983 claim). There is no "heightened pleading requirement" for civil rights claims. *Alston v. Parker*, 363 F.3d 229, 233 (3d Cir 2004). With respect to his excessive force claim, Plaintiff was required to present a "short and plain statement" containing sufficient factual detail to provide Defendants with notice of his claim and the grounds upon which it rests. *Phillips*, 515 F.3d at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although the Amended Complaint did not describe the punch delivered by Defendant Maschang in at the entrance of the Charlie Unit, it provided more than sufficient detail regarding the basis for the excessive force claim against this Defendant.

Furthermore, under Rule 15, Plaintiff may, with leave of court, file an amended complaint to add new claims or amplify his claims. Defendants argue that the new claim does not relate back. Pursuant to Rule 15 of the Federal Rules of Civil Procedure, "[a]n amendment relates back to the date of the original pleading when ... the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). As interpreted by the Supreme Court, this requires "the existence of a common 'core of operative facts' uniting the original and newly asserted claims." *Mayle v. Felix*, 545 U.S. 644, 659 (2005). A common core of operative facts exists if "the opposing party has had fair notice of <u>the general fact situation and legal theory upon which the amending party proceeds</u>." *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004). Thus, new claims will relate back if they "restate the original claim with greater particularity or amplify the factual circumstances surrounding the pertinent conduct, transaction or occurrence in the preceding complaint." *Id.* If, however, a new claim "asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth[,]" the claim will not relate back. *Mayle*, 545 U.S. at 650. "Put another way, the underlying question for a Rule 15(c) analysis is 'whether the original complaint adequately notified the defendants of the basis for liability the plaintiffs would later advance in the amended complaint.'" *Glover v. F.D.I.C.*, 698 F.3d 139, 146 (3d Cir. 2012) (citing *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 866 (D.C. Cir. 2008) (emphasis in original).

Here, the Amended Complaint alleges that Defendant Maschang, along with other Defendant corrections officers, used excessive force by tackling Plaintiff, pinning him, and beating him in the back, chest, and ribs while he was in handcuffs. In order to avoid detection by cameras, corrections officers, including Maschang, carried Plaintiff to the Sally Port where they

allegedly continued the beating by slamming Plaintiff's head into the floor, pulling out his dreadlocks, and kicking, punching, and threatening Plaintiff.

As explained above, although the Amended Complaint does not specifically assert that Defendant Maschang continued to punch Plaintiff at the exit to the Charlie Unit, the facts asserted in the Amended Complaint clearly put Defendant Maschang on notice that a basis for his liability, among others, was his use of excessive force against Plaintiff during the March 1, 2015 episode. The allegation that Maschang also punched Plaintiff at the exit of the Charlie Unit is not a new claim for relief different in time and type from the facts pleaded in the Amended Complaint; rather this allegation merely amplifies the factual circumstances of the assault. As such, the Court finds that this allegation would relate back for purposes of Rule 15.

For these reasons, the Court will deny summary judgment on this issue. For completeness, Plaintiff is provided leave to submit an amend complaint to add these factual allegations within 30 days of the date of this Order.

### c.  <u>Personal Involvement During Assault in the Sally Port Area</u>

Defendants next assert that Plaintiff's allegations of assault occurring in the Sally Port area should be dismissed be Plaintiff cannot show personal involvement on the part of either Defendant Plaza or Defendant Maschang.

As outlined in the Statement of Facts, Plaintiff has provided ample evidence that Defendants Plaza and Maschang participated in the assault against him on March 1, 2015. Defendants contends, however, that the Court should dismiss the excessive force claim with respect to this separate incident of assault in the Sally Port because there is insufficient evidence that these two Defendants participation in that portion of the assault.

Section 1983 liability requires a "showing of direct responsibility" by the named defendant and to eschew any "theory of liability" in which defendants played "no affirmative part in depriving any[one] ... of any constitutional rights," *Rizzo v. Goode*, 423 U.S. 362, 376–77 (1976)—including theories of vicarious or respondeat superior liability, *see Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see also Merklin v. United States*, 788 F.2d 172, 175 (3d Cir. 1986). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. "Each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 677. Because entities and supervisors may not be vicariously liable under § 1983 for the constitutional violation of a given individual, neither may that individual's cohorts who happen to be in the immediate vicinity. *See Anela v. City of Wildwood*, 790 F.2d 1063, 1067–68 (3d Cir. 1986) (observing that defendants may "not be held liable under section 1983 merely because they were members of a group of which some other members were guilty of abuses" (citing *Rizzo*, 423 U.S. at 370–71)); *Howell v. Cataldi*, 464 F.2d 272, 282 (3d Cir. 1972) (Although, the "[m]ere presence of a person, when an assault and battery is committed by another, even though he mentally approves of it, but without encouragement of it by word or sign, is not sufficient of itself to charge him as a participator in the assault.").

Thus, under the law of this Circuit, a plaintiff asserting excessive force must be able to show that the Defendant(s) directly participated in the constitutional wrong, and may not rely on the individual's mere presence at the scene. In *Sharrar v. Felsing*, 128 F.3d 810 (3d Cir. 1997), for example, the plaintiff alleged that an officer who handcuffed him had dislocated his shoulder but could not identify which, out of the 20 officers on the scene, was the perpetrator. The Third

Circuit concluded that there was "no evidentiary basis on which to hold the[ ] defendants liable" and affirmed the order of summary judgment in their favor on that basis. *Id.* at 821. Similarly, in *McNeil v. City of Easton*, 694 F. Supp. 2d 375, 399 (E.D. Pa. 2010), the district judge held that claim of the use of excessive force by an unidentified Easton police officer who allegedly kicked Plaintiff in the back of the head was "serious and troubling,", but he was constrained to grant defendants' motion for summary judgment because plaintiff had not provided any evidence as to which of the officers at the scene kicked him in the head.[3]

More recently, the Third Circuit, in *Jutrowski v. Twp. Of Riverdale*, 904 F.3d 280 (2018), considered a similar factual scenario where the plaintiff alleged that an unidentified officer kicked him in the face during his arrest, fracturing the plaintiff's nose.[4] *Id.* at 286. Because the plaintiff was unable to identify which of the officers in his immediate vicinity was the one who kicked him, he filed suit against the four officers who were in the immediate vicinity for excessive force, among other claims for falsifying evidence and giving misleading grand jury testimony. *Id.* at 287. Discovery established that the four officers were in the immediate vicinity, but the plaintiff could not in the course of discovery identity which of the officers inflicted the blow to his nose. In the absence of evidence identifying the perpetrator of the single blow during an otherwise lawful arrest, the district court granted summary judgment.

On appeal, Jutrowski argued that as long as a plaintiff can show that one of the officers used excessive force, he may haul before a jury all officers in the immediate vicinity without

---

[3] These decisions, relied on by Defendants, involve factual scenarios where an unidentified defendant police officer committed a discrete act of excessive force, and the plaintiff could not determine which officer on the scene inflicted the harm. That type of situation is starkly different from the alleged beating here, where the Plaintiff has clearly identified Defendants Plaza and Maschang as participants in the assault.

[4] The decision in *Jutrowski* was issued after briefing was completed on this motion.

proof of their personal involvement. *See id.* at 289. The Third Circuit rejected this argument, finding it axiomatic that "a defendant's § 1983 liability must be predicated on his direct and personal involvement in the alleged violation."

The Third Circuit also clarified and reaffirmed the holding in *Smith v. Messinger*, 293 F.3d 641 (3d Cir. 2002), a decision that is factually similar to the instant matter. There, an inmate-plaintiff alleged he was the victim of an unprovoked and unjustified beating. *Id.* at 649. The Court of Appeals reversed the grant of summary judgment on an Eighth Amendment claim, where the inmate-plaintiff, who had been beaten by a group of corrections officers, conceded that he could not see all five of the defendant-corrections officers during his alleged beating, but testified that all of them participated in the assault. As explained in *Jutrowski*, the issue in *Smith* was therefore a dispute about "the *extent* of each officer's participation" which "is … a classic factual dispute to be resolved by the factfinder."[5] *Jutrowski*, 904 F.3d at 290-91 (citing *Smith*, 293 F.3d at 650.) In contrast the "*Howell* and *Sharrar* involved a dispute about the *possibility* of each officer's participation" which is insufficient without more to reach a jury. (emphasis in original.)

Here, there is ample evidence in the summary judgment record that Plaza and Maschang participated in the assault on Plaintiff on March 1, 2015, and there is sufficient evidence that they

---

[5] In *Smith*, the Third Circuit also observed that it was undisputed that all of the named officers were in the vicinity at some point when Smith alleged he was beaten. 293 F.3d at 650. In *Jutrowski*, the Third Circuit cautioned that this observation should not be taken to suggest that mere presence in the vicinity of a beating is sufficient for liability. Rather, the observation merely indicated that there was objective corroboration of Plaintiff's testimony that all of the defendants participated in the beating. 904 F.3d at 291 n.10. This is not a case where Defendants were merely in the vicinity of a beating and may not have been participants. Rather, Defendants are attempting parse the beating, moment by moment and blow by blow, and obtain summary judgment for each kick or punch that cannot be attributed to either of them. Nothing in the Third Circuit's precedent suggests that courts should analyze claims of excessive force in this manner, and the Court declines to do so.

continued to participate in the assault in the Sally Port and were talking to Plaintiff during that portion of the beating. Plaintiff testified that he was punched and kicked by corrections officers for the five to ten-minute period in which he was held in the Sally Port, a known "blind spot," after he was escorted out of the Day Room. (*See* Gibbons Cert., Ex. A, 70:10-24, 71:13- 16, 72:2-19, 75:14 – 77:16.) According to his testimony, Plaintiff is aware that Defendant Plaza and Defendant Maschang were both in the Sally Port during this period because they both spoke to him: Defendant Plaza telling Plaintiff that he thought he was tough, and that Defendant Plaza would "show [him] who the tier was being operated by," and Defendant Maschang telling Plaintiff that he was going to "show [you] Muslims." (*Id.*, 72:2-13, 75:19 – 76:4, 79:16-22; Ex. X (wherein Plaintiff clarified that statements regarding Muslims were made by Defendant Maschang).) Defendants Plaza and Maschang both conceded that they were present in the Sally Port immediately after the assault in the Day Room. (*See* Duffy Cert., Ex. A, 213:2-11 (wherein Defendant Plaza confirmed that he briefly left his post in the Day Room to enter the Sally Port, immediately after Plaintiff was led into the Sally Port); Id., Ex. V, 132:19 – 134:19 (wherein Defendant Maschang confirms that he was one of two corrections officers to escort Plaintiff from the Day Room into the Sally Port). Plaintiff testified that his ability to specifically correlate particular punches and kicks to individual officers was hindered by the fact that he was being "continuously pushed into the concrete," forced to remain "face down on the floor," and continuously assaulted. (*Id.*, 72:14-19, 80:20; 82:4-83:5.) The factual issues here plainly relate to the extent of Plaza and Maschang's participation in the March 1, 2015 assault and not the mere possibility that they participated in the assault on March 1, 2015.[6] As such, the Court denies

---

[6] Having found a material factual dispute regarding the extent of the Defendants' participation in the portion of the assault that occurred in the Sally Port, the Court need not reach Plaintiff's

summary judgment as to Defendants' personal involvement in the portion of the assault that occurred in the Sally Port.

### d. Deliberate Indifference to Medical Needs

Defendants next assert that they are entitled to summary judgment on Plaintiff's allegations of inadequate medical care against Defendant Maschang because Plaintiff cannot show the requisite personal involvement.

Claims for inadequate medical care are evaluated under a "deliberate indifference standard to prisoners' serious medical needs." *Natale v. Camden Cty. Corr. Facility,* 318 F.3d 575, 582 (3d Cir. 2003). Thus, the "evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Id.* Deliberate indifference has been found "in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir. 1999) (emphasis added).

Defendants argue that Defendant Maschang, as non-medical staff, had no duty to ensure that Plaintiff received medical care. Relying on *Spruill v. Gillis,* 372 F.3d 218, 235-36 (3d Cir. 2004), Defendants assert that where prisoners are under the care of medical professionals and sue nonmedical staff, the non-medical prison officials "will generally be justified in believing that the prisoners are in capable hands" *Id.* at 236. As explained by the Third Circuit:

> If a prisoner is under the care of medical experts . . ., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is

---

argument that Defendants Plaza and Maschang failed to intervene in the portion of the assault in the Sally Port.

> promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability.

*Id.* The court of appeals in *Spruill* considered circumstances where a plaintiff was already under the care of medical professionals for his back injury and had complained to non-medical prison officials about the adequacy of the medical care he was receiving. The Third Circuit affirmed the dismissal of his Complaint because it did not allege that his condition was so dire and obvious that the non-medical professional's failure to summon immediate medical attention for the plaintiff amounted to deliberate indifference. Such is <u>not</u> the case here.

Defendant Maschang directly participated in the assault on March 1, 2015 and was aware of Plaintiff's general physical condition following the assault. It is undisputed that Defendant Maschang accompanied Plaintiff into the nurse's station for his medical evaluation. (*See* Gibbons Cert., Ex. A, 106:14-107:2; *see also* Duffy Cert., Ex. V, 88:8-89:3.) In sworn testimony, Plaintiff recalled that when the nurse asked him if he was okay, Defendant Maschang responded before Plaintiff could, indicating that Plaintiff was okay. (*See* Gibbons Cert., Ex. A, 106:14 - 107:2.) Plaintiff also said that his side hurt and that he wanted medical attention. (*Id.*) He was instead rushed out of the medical building into a detention area, without receiving any medical evaluation or treatment. (*Id.*). Subsequent medical evaluation shows that Plaintiff sustained a traumatic brain injury and a fractured right rib. (*See* Duffy Cert., Ex. J, p. 2-4; see also Ex. K (radiological report regarding rib fracture).) Plaintiff asserts that Defendant Maschang prevented Plaintiff from receiving necessary medical treatment by interfering with Plaintiff's evaluation by medical staff.

21

Viewing these facts in the light most favorable to Plaintiff, the Court finds that Defendant Maschang did not simply leave Plaintiff's care to other medical professionals. Instead, the facts presented create a triable issue as to whether Defendant Maschang had direct knowledge that Plaintiff had just been beaten (and indeed had participated in that beating), but nevertheless told the treating nurse that Plaintiff was okay and did not need treatment, thus interfering with and preventing timely medical care for Plaintiff's injuries. The fact that the treating nurse could also be liable for her negligence or deliberate indifference does not negate Defendant Maschang's own deliberate indifference to Plaintiff's medical needs. For these reasons, the Court will deny summary judgment on the deliberate indifference claim as to Defendant Maschang.

### e. **Qualified Immunity**

Finally, Defendants assert that they are entitled to qualify immunity on Plaintiff's free exercise claim <u>and</u> for the portion of the assault that occurred in the Day Room.

State actors, such as police officers, are entitled to a defense of qualified immunity on excessive force claims, "shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "In other words, the doctrine of qualified immunity provides that officers may be shielded from liability in a civil rights suit if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Epifan v. Roman*, No. 3:11-CV-02591-FLW, 2014 WL 4828606, at *10 (D.N.J. Sept. 29, 2014) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Consequently, the qualified immunity standard is one of "objective legal reasonableness." *Id.* This protection exists "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (citing *Pearson v.*

22

*Callahan*, 555 U.S. 223 (2009) (citation omitted)). To determine whether a government official is entitled to qualified immunity, a court may begin with either prong of the analysis outlined in *Saucier v. Katz*, 533 U.S. 194 (2001), using the flexible approach endorsed in *Pearson*. *Id.* at 287. One prong asks whether "taken in the light most favorable to the party asserting the injury ... the facts alleged show the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. The other prong inquires "whether the right was 'clearly established' at the time of defendant's alleged misconduct.'" *Id.* In other words, "qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson*, 555 U.S. at 232 (citation omitted).

### i. Qualified Immunity on Free Exercise Claim

Defendants first argue that they are entitled to qualified immunity on Plaintiff's free exercise claim. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I. Prisoners do not forfeit this right by reason of their conviction and confinement in prison. *See DeHart v. Horn*, 227 F.3d 47, 50 (3d Cir.2000). For a prisoner, this right, however, is more limited. *Id.* at 50–51. To establish a violation of the Free Exercise Clause, a plaintiff must generally show that defendants prevented him from engaging in his religion without any justification reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987). In determining whether a restriction is reasonably related to legitimate penological interests, courts weigh four factors:

> First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it.... Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards,

and prison resources generally.... [F]ourth, a court must consider whether there are alternatives to the regulation that fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests.

*DeHart*, 227 F.3d at 51 (citations and internal quotation marks omitted); *see also Williams v. Sec'y Pennsylvania Dep't of Corr.*, 450 F. App'x 191, 194–95 (3d Cir. 2011).

In his Opposition Brief, Plaintiff states that

> Plaintiff's free exercise claim <u>does not challenge any policy of Northern State Prison</u>. To the contrary, Plaintiff's free exercise claim is that Defendant Plaza maliciously interfered in with his ability to practice his religion through a violent enforcement of a non-existent no-prayer policy, and that Defendant Maschang similarly interfered by expressing his intention, while physically assaulting Plaintiff to "show you Muslims."

(Pl. Opposition at 29 (emphasis added).) Based on Plaintiff's clarification that he does not challenge any policy or regulations governing prayer at Northern State Prison, that claim is dismissed.

Plaintiff contends, however, that he may maintain a free exercise claim against Defendants Plaza and Maschang based on their intentional interference with his religious exercise. To support his free exercise claim, Plaintiff relies on *Brown v. Borough of Mahaffey, Pa.*, 35 F.3d 846 (3d Cir. 1994), in which the Third Circuit held that a "substantial burden" analysis is inappropriate in cases involving the "intentional burdening of religious exercise." *Id.* at 849. In *Brown*, the plaintiffs alleged that council members and police officers in the Borough manifested hostility towards their religious activity by intentionally locking the gate between a public park and property which was to be used for a religious tent revival meeting to impede access to their revival meetings. 35 F.3d at 849. The Third Circuit, in at least one unpublished decision, has extended the reasoning in *Brown* to prisoner cases. *See Mack v. Yost*, 427 F. App'x 70, 74 (3d Cir. 2011) (citing *Brown*, 35 F.3d at 849–50 (3d Cir.1994) (holding that plaintiff asserting free exercise claim on the basis of intentional targeting of religious exercise need not

show a "substantial burden" because "[a]pplying such a burden test ... would make petty harassment of religious ... exercise immune from the protection of the First Amendment").[7] Plaintiff argues that Defendant Plaza similarly denied him the opportunity to pray in the Day Room, in the absence of any specific policy prohibiting such prayer, and that Defendant Maschang interfered by similarly expressing his intention, while physically assaulting Plaintiff, to "show [you] Muslims."

Here, Defendants have not met their burden to show that they are entitled to qualified immunity on Plaintiff's claim that Plaza and/or Maschang intentionally targeted the free exercise of his religion, in light of the Third Circuit's decisions in *Brown* and *Mack*, and other relevant precedent. Furthermore, as Plaintiff points out, there are disputes of material fact regarding whether there is a policy at Northern State Prison prohibiting prayer in the Day Room, which bears on the issue of whether Defendant Plaza intentionally targeted Plaintiff's free exercise or merely sought to enforce a valid prison policy. The Court declines to grant summary judgment as to whether Moving Defendants intentionally targeted Plaintiff's free exercise of religion in the absence of adequate briefing of these issues and in light of the disputed material facts.

---

[7] In *Mack*, the plaintiff worked in the commissary but was not permitted to handle pork products due to his Muslim faith. A corrections officer slapped the plaintiff on the back and told him "you'll be looking for another job soon." Staff and other inmates snickered at Mack throughout the day until an inmate eventually told him that he had a label on his back reading "I LOVE BACON." The next day, Mack asked the corrections officer why he had put the label on his back and Roberts again told him "don't worry you'll be looking for another job soon." Two days later, the corrections officer loudly told Mack in the presence of other inmates and staff in the commissary that "there's no good Muslim, except a dead Muslim." The plaintiff complained to the commissary supervisor. One week later, he was fired from his job, purportedly for "bringing in inmate shoppers commissary lists," an allegation which the plaintiff denied. *See Mack*, 427 F. App'x at 71. In addition to First Amendment retaliation claims, Mack expressly asserted that defendants violated his First Amendment right to practice as a Muslim, *id.* at 73, The Third Circuit reversed the dismissal of the plaintiff's case at screening on both the retaliation and free exercise claims and remanded to the district court for consideration of these claims.

## ii.  Qualified Immunity on Excessive Force in the Day Room

Finally, Defendants contend that the video evidence establishes that they are entitled to qualified immunity for the portion of the assault that occurred in the Day Room, namely Defendant Plaza's discharging of pepper spray at Plaintiff and Defendant Maschang's "pat down" of Plaintiff.

"After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quotation omitted). "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Id.* "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992); *see Wilkins v. Gaddy*, 559 U.S. 34 (2010). As such, in considering an excessive force claim, "a district court must consider whether force was applied in a 'good-faith effort to maintain or restore discipline, or maliciously and sadistically' to cause harm." *Passmore v. Ianello*, 528 F .App'x 144, 147 (3d Cir. 2013) (quoting *Hudson*, 503 U.S. at 6-7). Relevant factors include: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by prison officials; and (5) any efforts made to temper the severity of a forceful response." *Id.*

In assessing a correction officer's claim for qualified immunity with respect to an excessive force claim, the District Court must view the facts in the light most favorable to the plaintiff. *See Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009). If there is a material factual dispute regarding the reasonableness of the force applied by corrections officers against a prisoner, then the issue of qualified immunity cannot be resolved on summary judgment. *Id.* at 327.

Defendants first argue that Defendant Plaza was entitled to discharge pepper spray at Plaintiff because he ordered Plaintiff not to walk away but he refused to comply and turned to leave. Defendants admit that the conversation that occurred between Plaintiff and Defendant Plaza prior to the discharge of pepper spray is disputed; however, they assert that this dispute is not material because Plaza was constitutionally entitled to use OC spray based on D'Costa's version of the facts. (*See* Moving Brief at 35.) It appears, however, that Plaintiff disputes Defendants' contention that he defied Plaza's order not to walk away and asserts that there is a factual dispute regarding whether Plaza told Plaintiff to walk away or not walk away. (*See* RSMF at ¶¶ 19-20.) As such, the facts are disputed.

Furthermore, Defendants seek qualified immunity but cite to <u>no decisions</u> in the Third Circuit or other circuits involving the use of pepper spray or other chemical agents on prisoners.[8] Instead, they argue without citation that the use of force was justified in the face of Plaintiff's failure to comply with a "direct order" in the prison context. After failing to discuss decisions involving the use of pepper spray on prisoners, Defendants conclusively argue that "no such

---

[8] A cursory search reveals that there are numerous federal decisions addressing the use of chemical agents on prisoners, and the Court declines to do the Defendants' work by collecting and analyzing these cases for purposes of qualified immunity. Furthermore, the Court has not found any decisions stating that a prisoner's failure to obey a direct order always renders the use of OC spray reasonable.

case" establishes Plaintiff's right to be free from the use of chemical agents because he refused to comply with the direct orders of corrections officers. Defendants cite only to N.J. Stat. Ann. § 2A:62A-20, which provides civil immunity to those deploying chemical agents such as pepper spray.  Defendants, acknowledge, however, that this statutory provision does not provide constitutional immunity.

Defendants next argue that the available video surveillance footage resolves all material disputes of fact as to excessive force by Defendant Maschang in the Day Room, as the available video shows that Defendant Maschang performed only an open hand pat down of Plaintiff. Defendants reason that Plaintiff does not have a constitutional right to be free from pat down searches, and, as such, Defendant Maschang is entitled to qualified immunity for the portion of the assault that occurred in the Day Room.  (*Id.* at 36.)

Plaintiff contends that Defendants' qualified immunity arguments suffer from the same defect as their other arguments for dismissal – namely that Plaintiff has not asserted a cause of action for "assault in the Day Room," but rather a single claim for excessive force premised on all assaultive conduct by Defendants during the March 1, 2015 incident. (Plaintiff's Opposition at 31.) Defendants further argue that the video footage is not dispositive as it depicts the events in the Day Room from a single angle and the other recordings of the Day Room during the relevant incident were improperly spoliated by the DOC.[9]

The Court agrees with Plaintiff and denies without prejudice Defendants' request for qualified immunity with respect to the portion of the assault that occurred in the Day Room. Even if the Court were to analyze the initial discharge of pepper spray separately from the rest of

---

[9] Plaintiff states its intention to seek an adverse inference based upon this spoliation at or prior to trial.

the assault, there are, at best, genuine issues of material fact as to whether the Defendant Plaza's discharge of OC spray was justified under the circumstances, and Defendants' moving brief fails to discuss the relevant case law regarding the discharge of chemical agents on prisoners or cite to any decisions in support of their argument that use of OC spray is always justified when a prisoner disobeys a direct order.

Defendants' arguments seeking qualified immunity for Defendant Maschang's conduct in the Day Room appears to misconstrue Plaintiff's excessive force claim, which is premised on the Defendant Maschang's participation in the March 1, 2015 assault on Plaintiff and not a discrete claim that Defendant Maschang used excessive force by patting Plaintiff down in the Day Room. As explained earlier in this Opinion, there are issues of material fact as to the extent of Maschang's participation in the March 1, 2015 assault that preclude summary judgment in his favor, and the Court declines to find that he is entitled to qualified immunity for a tiny fraction of his conduct, i.e., the alleged pat down in the Day Room, in the absence of any allegation by Plaintiff that the excessive force claims against Defendant Maschang are premised on an unconstitutional pat down. Furthermore, the available video footage does not conclusively show the precise actions of Maschang or the other corrections officers surrounding Plaintiff in the Day Room. For these reasons, the Court denies without prejudice Defendants' request for summary judgment on the basis of qualified immunity.

## V.    **CONCLUSION**

For the reasons explained in this Opinion, the motion for summary judgment is denied without prejudice. Based on Plaintiff concession that he is not challenging any policies or regulations governing prayer at Northern State Prison, the Court dismisses that aspect of his free

exercise claim. The Court, however, denies summary judgment as to whether Defendants intentionally interfered with Plaintiff's exercise of his religion. An appropriate Order follows.

Dated: _____

Madeline Cox Arleo, U.S.D.J.